**GREYBARK ADVERTISING, INC., Plaintiff,**

v.

**AMBA MARKETING SYSTEMS, INC. and the National Media Group, Inc., Defendants.**

**No. 77 Civ. 1381.**

United States District Court, S. D. New York.

July 12, 1979.

Burns, Jackson, Miller, Summit & Jacoby, New York City, for plaintiff; Ruth Balen, New York City, of counsel.

Monasch, Chazen & Stream, New York City, for defendant Amba Marketing Systems, Inc.; Arnold C. Stream, New York City, of counsel.

Beldock, Levine & Hoffman, New York City, for defendant The National Media Group, Inc.

LASKER, District Judge.

Amba Marketing Systems, Inc. moves for summary judgment under Rule 56(b), Fed. R.Civ.P., to dismiss the first and second counts of the complaint in this breach of contract action; and under Rule 12(b)(6) to dismiss the seventh count for failure to state a claim upon which relief can be granted. The motion is denied.

Greybark is an advertising agency which specializes in marketing goods through "direct response" television commercials. Ambassador International, a division of Amba

Marketing Systems, Inc., is a marketing company which sells products directly to consumers, primarily by means of mail order catalogs. In October of 1974, representatives of Greybark and Ambassador met at a trade convention in New Orleans and entered into the oral agreement which is the subject of this lawsuit. The complaint alleges that the parties agreed that Greybark would develop and test a "marketing and promotional program" for selected products of Ambassador (Complaint, ¶ 6). In consideration for these services, the complaint continues, Ambassador agreed

> "that if the tests proved to be successful in promoting and marketing the products tested, that it would promote and market the products on a full-scale nationwide basis and that it would place all of its advertising with respect to these products through Greybark. It was understood by the parties that Greybark would receive the industry-wide standard commissions of 15% of the amount of advertising purchased by said defendant." (*Id.*)

Greybark prepared a commercial to sell an Ambassador ladies' handbag but, although market tests proved successful (¶ 8), Ambassador "placed the advertising for the handbag with an entity other than Greybark" (¶ 9), thus depriving plaintiff of substantial commissions. Greybark sues Ambassador, *inter alia*, for breach of the oral agreement (Count I), a declaration of the rights between the parties (Count II), and conspiring with National Media Group (Media Group), the advertising agency which replaced Greybark, to appropriate Greybark's "opportunity" and "work product" (Count VII). It also sues Media Group for having induced Ambassador to terminate its relationship with Greybark by undercutting Greybark's commission rate in alleged violation of the rules and practices of the advertising industry.

*The Motion for Summary Judgment as to Counts I and II*

Ambassador argues that the agreement described in the complaint sets out an "open-end undertaking on the part of Ambassador to place *all* of its advertising with respect to products tested by Greybark through Greybark alone." (Affidavit of Ambassador's Counsel, January 5, 1979, ¶ 42) Because this alleged obligation apparently would continue until Ambassador decided to stop selling the products in question, Ambassador argues that the oral agreement, by its terms, could not have been performed within one year of its making and is therefore barred by New York's statute of frauds, N.Y.Gen.Oblig.Law § 5–701, subd. a, par. 1. Alternatively, Ambassador argues that the breach of contract claim fails because the depositions of Greybark's three top officials establish that the agreement was nothing more than an engagement at will, without fixed duration or limitation on the right of either party to terminate, which Ambassador was therefore free to end.

Greybark's reply elaborates on the terms of the oral agreement and, in doing so, alters somewhat the allegations in the complaint.[1] A detailed description of the alleged agreement is furnished in the affidavit of Jerome Shapiro, President of Greybark and one of the individuals whose deposition is relied upon by Ambassador in moving for summary judgment.

Shapiro states that, rather than involving an ongoing right to place all advertisements for certain goods, the subject of the oral agreement was limited to Greybark's interest in the distribution of a specific commercial which it prepared for Ambassador. During the October meeting, Greybark undertook to prepare a television commercial, at cost, for selected products of Ambassador and then to test it on sample television stations, for which Greybark claims it was to receive a 15% commission on all sales to

---

1. The allegations contained in Jerome Shapiro's affidavit of January 29, 1979, are sufficiently important to warrant consideration in dealing with Ambassador's motion. However, in the interests of clarity and procedural regularity, Greybark is required to amend its complaint to conform to the allegations in this affidavit within twenty days of the filing of this opinion.

the stations. (¶ 18) Ambassador is said to have agreed that, if the tests proved successful, it would "roll-out" the commercial through Greybark, that is, advertise it in television markets throughout the country (*id.*). The commercial was prepared in December of 1974 and tested successfully in the following January (¶ 26). However, instead of approving an immediate roll-out, Ambassador repeatedly instructed Greybark to keep testing. Finally, in March of 1976, Ambassador gave a tape of the commercial prepared by Greybark, together with the test results, to Media Group which then rolled out the commercial nationally and allegedly received half a million dollars in commissions for its part in the distribution (¶ 27).

Shapiro asserts that he advised Ambassador's representatives at the October meeting that the tests would be ready by January of 1975 and that the roll-out could take place immediately thereafter (¶ 18). He further states that the duration of direct response advertising is, by nature, extremely short; that most "roll-outs" last no more than "a few months", and that a roll-out of over six months "is an occurrence never foreseeable or even contemplated" (¶ 13). Finally Shapiro disputes the credibility of Ambassador's contention that the agreement was terminable at will by asserting that the only earnings of significance to Greybark in an arrangement such as that alleged here are those secured from a roll-out; therefore Greybark would never agree to a piecemeal arrangement whereby it would merely prepare a commercial or test it without more (¶ 16).

■ Greybark's claim, as described in the Shapiro affidavit, thus centers on Ambassador's failure to roll-out the particular commercial prepared by Greybark, through Greybark. This alleged agreement does not fall within the statute of frauds since nothing in its terms barred performance within one year. See N.Y.Gen.Oblig.Law § 5–701 subd. a, par. 1. Indeed, as specified by Shapiro, the express terms of the agreement provided for termination within several months if the tests were unsuccessful,

and past experience rendered it likely that, even in the event of a roll-out, the project would be completed within a year. Under these circumstances, it is irrelevant that the actual performance of the agreement took longer than one year, *Shirley Polykoff Advertising, Inc. v. Houbigant, Inc.,* 43 N.Y.2d 921, 922, 403 N.Y.S.2d 732, 733, 374 N.E.2d 625 (1978); *Freedman v. Chemical Construction Corp.,* 43 N.Y.2d 260, 265, 401 N.Y.S.2d 176, 180, 372 N.Y.S.2d 12 (1977), and we find that the agreement alleged in Shapiro's affidavit is not barred by the statute of frauds.

As indicated above Ambassador further argues that the deposition testimony of Shapiro and two other officials of Greybark, all of whom were present at the October, 1974 meeting, firmly establishes that the agreement was terminable at will. However, the portions of the depositions relied on by Ambassador are inconclusive: they fail to describe the oral agreement with any degree of particularity. While the vagueness of the descriptions by these witnesses may reflect adversely on Greybark's ability to prevail at trial, it bars the grant of summary judgment, particularly in light of the detailed opposing account of the agreement set out in Jerome Shapiro's affidavit. Indeed, the description of the agreement set out in Shapiro's sworn statement is sufficiently detailed and compelling that it would raise a triable question of fact as to the nature of the agreement even if the deposition testimony did suggest that the agreement was terminable at will.

Ambassador's motion for summary judgment as to Count II, which seeks a declaration of the rights between the parties, is dependent on its argument that Greybark has no rights against Ambassador under the oral agreement. Since we find that there is a question of fact as to the nature of the agreement, this motion for a declaration must also be denied.

*Motion to Dismiss Count VII*

Count VII charges that Ambassador:

"conspired with Media Group to appropriate the opportunity created by Greybark

and Greybark's work product, and to jointly benefit from the use thereof, to Greybark's detriment, by agreeing with Media Group that it would retain 50% of the commissions on television time purchases to which Greybark was entitled," and seeks restitution from Ambassador of the portion of the commissions "wrongfully obtained" by it. As restated more forcefully in Greybark's answering papers, this claim "seeks restitution of the commissions Ambassador received by terminating its agreement with Greybark and rolling out with Media Group under a kickback arrangement."

Ambassador argues that Count VII does not properly allege a tort because the purpose of the conspiracy was not illegal. It contends that the "opportunity to promote, market and sell Ambassador's own products" as well as the commercial prepared by Greybark belonged to Ambassador alone. However, this argument begs the very question upon which the complaint turns: whether Ambassador unfairly deprived Greybark of the opportunity to distribute the commercial which it had created. Similarly, the question whether Ambassador unjustly enriched itself by retaining half of the 15% commission which Greybark claims it is entitled to depends on whether Greybark can establish that Ambassador committed itself to pay this money to Greybark. Until the nature of Greybark's interest in the promotion of the commercial is established, this count must be deemed to state a claim upon which relief may be granted.

Finally, Ambassador argues that Count VII merely repeats the breach of contract claim set out in Count I and should be dismissed as surplusage. However, Count VII alleges that, by conspiring with Media Group, Ambassador violated Greybark's rights in a manner legally distinct from the breach of contract. Therefore, it may stand even though some of the same

facts are applicable to both claims. *North Shore Bottling Co. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968).[2]

For the reasons stated, Ambassador's motion for summary judgment as to Counts I and II and to dismiss Counts VII is denied.

It is so ordered.

---

2. Ambassador also disputes Greybark's claim that the commission rate agreed to by Ambassador and Media Group constituted an illegal "kickback" scheme. However, this argument is not relevant to Greybark's claim in Count VII which is based on unjust enrichment rather than the possible illegality of the commission agreement between Ambassador and Media Group.