**GB MARKETING USA INC., Plaintiff,**

v.

**GEROLSTEINER BRUNNEN GmbH & CO., Miller & Co. Gesellschaft Fuer Import und Export MBH, and Stockmeyer (North America) Inc., Defendants.**

No. Civ. 91–6136L.

United States District Court,
W.D. New York.

Dec. 9, 1991.

Co. Gesellschaft Fuer Import und Export MBH and Stockmeyer (North America) Inc.

## DECISION AND ORDER

LARIMER, District Judge.

This is an action for equitable relief and monetary damages in connection with the sale and importation of Gerolsteiner Sprudel mineral water from Germany. Jurisdiction is based on the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and on diversity of citizenship under 28 U.S.C. § 1332. Defendants have moved to dismiss the complaint or in the alternative for summary judgment.

Defendants' motion for summary judgment on plaintiff's first cause of action is granted; defendants' motion to dismiss plaintiff's remaining causes of action is denied.

## FACTS

In 1988, plaintiff, GB Marketing USA Inc. ("GB"), a New York corporation, began distributing Gerolsteiner Sprudel ("the water") in the United States. The water was bottled in Germany by defendant Gerolsteiner Brunnen ("Gerolsteiner"), a German corporation, and exported to America by defendant Miller & Co. ("Miller"), also a German corporation. Miller in turn sold the water to GB in the United States for distribution.

Although this arrangement lasted for several years until 1991, there was never a written contract between GB and Gerolsteiner or between GB and Miller. There were several draft agreements that were circulated but none was ever formally executed.

In an August 24, 1988 telex to Miller's President Jens Saggau ("Saggau"), Kenneth Gauntlett ("Gauntlett"), President of GB, expressed some dissatisfaction with the design of the label that was then being used on the bottles that were to be distributed in the United States. *See* Exhibit C to Gerolsteiner's Reply Memorandum of Law. Gauntlett suggested that the label be replaced with one that he had "designed." Accompanying the telex was a faxed copy

David Rothenberg, Geiger & Rothenberg, Rochester, N.Y., for plaintiff GB Marketing USA Inc.

Kenneth A. Payment and Fred G. Aten, Jr., Harter, Secrest & Emery, Rochester, N.Y., Thomas V. Heyman and Theresa Gillis, Jones, Day, Reavis & Pogue, New York City, for defendant Gerolsteiner Brunnen GmbH & Co.

Lawrence J. Andolina, Harris, Beach & Wilcox, Rochester, N.Y., J. Hayes Kavanagh, Kavanagh, Peters, Powell & Osnato, New York City, for defendants Miller &

of an existing Gerolsteiner label, together with a rendering of Gauntlett's label. Gauntlett pointed out the differences between the two labels, which included a rearrangement of certain elements, some different colors, and the addition of the words "Rich in Calcium" on Gauntlett's label. *Id.* There were also important aspects of the existing label that the proposed label retained; for example, the style of type was the same, and both labels used certain graphic images, particularly a lion inside a seven-pointed star (a Gerolsteiner trademark), and four gold medallions. All of these labels have been submitted to the Court in connection with these motions.

There followed some correspondence between Gauntlett and Saggau concerning the details of the new design. Saggau relayed to Gauntlett some of Gerolsteiner's wishes concerning the appearance of the label. In reference to Gauntlett's desire to copyright the label, Saggau stated in an August 25 fax that "They [Gerolsteiner] cannot show © 1988 FAMG[1] but feel that they are properly protected anyway against someone stealing layout of label because of their TRADEMARK." *Id.*

In another August 25 telex, Gauntlett assured Saggau that "i have no interest in tying up this label for my personal benefit even tho it's my creation.... what i am trying to protect is the design of the label, particularly method in which we present high calcium claim." Gauntlett urged Saggau to agree to allow him to obtain the copyright, saying, "think about it. It's very simple to do now, it may come back to haunt us all later." *Id.* This last sentence would prove unexpectedly prophetic.

In a fax on August 26, Saggau told Gauntlett that Miller would approve the new label, although he added that the color of part of Gauntlett's proposed design would have to be changed. Saggau also

indicated that Gauntlett could copyright the label, stating, "We will now incorporate C 1988 FAMG. So things are being done your way." *Id.* Shortly thereafter, Gerolsteiner began using labels with the notation "© 1988 FAMG."

On April 18, 1989, Gauntlett, acting through an agent, submitted a registration form for the label to the United States Copyright Office (Registration Number TX 2 672 769). On the form, Gauntlett listed himself as the author, and in response to an instruction to "describe nature of the material created by this author in which copyright is claimed," Gauntlett stated, "entire text and art work." Gauntlett never indicated that he was acting on behalf of Gerolsteiner or Miller in submitting the registration application. There is also no evidence that he submitted copies of this form to Gerolsteiner.

Gauntlett did not fill out space 6, entitled "Derivative Work or Compilation," which asked the registrant to "Identify any preexisting work or works that this work is based on or incorporates," and to "Give a brief, general statement of the material that has been added to this work and in which copyright is claimed." In short, Gauntlett never mentioned on this form, or apparently anywhere else, that the material he wished to copyright was based to a substantial degree on the existing Gerolsteiner label.

In addition to the label, Gauntlett also registered a copyright for a four-pack carton (Registration Number TX 3 130 818). On the registration form for the carton, which was submitted some time after the label registration,[2] Gauntlett described the material in which he claimed a copyright as "Some Text." Space 6, dealing with derivative works, was again left blank.

---

**1.** "FAMG" stood for First American Marketing Group, the corporate predecessor to GB.

**2.** It is unclear when this copyright was registered. The registration form states that it was received by the Copyright Office on July 29, 1991. However, it also lists June 28, 1990 as the effective date of registration and as the date on which the deposits were received. Donald C.

Studley, who submitted the form as GB's agent, signed it July 24, 1991. Gauntlett Affidavit, 10/10/91, Ex. B. Since the effective date of a copyright registration is the day on which the application, deposit and fee have been received in the Copyright Office, *see* 17 U.S.C. § 410(d), it therefore appears that this registration became effective no earlier than July 29, 1991.

For reasons that are not altogether clear at this point, some problems arose in the relationship between GB and Miller. These problems eventually led to Miller's termination of the relationship in January 1991. Miller thereafter began using defendant Stockmeyer (North America) Inc. ("Stockmeyer"), a New Jersey corporation, as its American distributor.

GB commenced the instant action on April 5, 1991. The complaint asserts five causes of action.

In the first claim, GB alleges that defendants have infringed its copyrights on the bottle label and on the four-pack wrapper. GB seeks an order permanently enjoining defendants from infringing the copyrights, and directing defendants to turn over all of plaintiff's copyrighted materials in defendants' possession. GB also requests damages for the infringement.

The remaining claims are based on diversity jurisdiction under 28 U.S.C. § 1332. The second cause of action is based on a promissory estoppel theory. GB alleges that in 1988 it became the exclusive U.S. distributor of the water, and that Gerolsteiner and Miller assured GB that it would continue in that capacity. In reliance on these promises, GB built up a market for the water in this country, expending time and money in anticipation of a long-term relationship. GB alleges that Gerolsteiner and Miller unjustifiably terminated their relationship with GB, damaging GB in the amount of 5.6 million dollars.

The third, fourth and fifth causes of action are based on theories of quantum meruit, unjust enrichment, and breach of contract respectively.

## DEFENDANTS' MOTION

Gerolsteiner, which has not answered the complaint, moves in the alternative for dismissal or summary judgment on plaintiff's first cause of action. Gerolsteiner contends that: the first cause of action fails to state a claim upon which relief can be granted; that the court lacks both subject matter jurisdiction over this claim, and personal jurisdiction over Gerolsteiner and that the rest of the causes of action should be dismissed on the grounds of improper venue and lack of personal jurisdiction.

Miller and Stockmeyer, which have answered the complaint, have not filed separate motions but have joined in Gerolsteiner's motion for summary judgment on the first cause of action, and in the motion to dismiss for improper venue.

### 1. Personal Jurisdiction Over Gerolsteiner

Gerolsteiner contends that the court lacks personal jurisdiction under N.Y.C.P.L.R. § 302(a)(1), which allows a court to exercise personal jurisdiction over a non-domiciliary which "transacts any business within the state," provided that the cause of action arises out of the business transacted here. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985). Gerolsteiner contends that it has not transacted business in New York within the meaning of the statute, and that even if it has, there is no nexus between that business and GB's claims.

Personal jurisdiction in this diversity action is determined by reference to the law of New York. *Id.* at 57. In this case, the relevant statute is C.P.L.R. § 302(a)(1) and it states that "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state ..."

The parties here have concentrated on the first part of this section, *i.e.*, the transaction-of-business test. I believe, however, that the second part of the statute—the "contracts anywhere" provision—is more germane and relevant as to the first (copyright) and fifth (breach of contract) causes of action. This language was added to the statute in 1979 to abrogate the rule that the "mere shipment" of goods into New York could not support jurisdiction. *Cleopatra Kohlique, Inc. v. New High Glass, Inc.*, 652 F.Supp. 1254 (E.D.N.Y.1987).

Gerolsteiner contends that *it* never sold its water here, but instead sold it in Germa-

ny to Miller, which took title to the water there. Gerolsteiner claims that it had no control over what happened to the water from the time that Miller took it.

Even if Gerolsteiner did relinquish title to the water in Germany, however, Gerolsteiner clearly knew that some of that water was bound for New York. Gerolsteiner's application for permits to sell the water in New York makes that plain, regardless of whether that activity amounted to the transaction of business in the state.

Despite its contention that it had no control over the water once Miller took title to it in Germany, then, Gerolsteiner was certainly not ignorant of or unconcerned with the water's destination. That fact is further evidenced by Gerolsteiner's sending representatives to New York on more than one occasion. While this may have been done at Miller's request, as Gerolsteiner claims, it nevertheless shows that Gerolsteiner understood that its water was being sold in New York, and that it was interested in maintaining or increasing its sales here. These facts establish that Gerolsteiner did contract to supply goods in New York.

This holding finds support in the case law. For example, in *Cleopatra Kohlique*, the court held that personal jurisdiction existed over a manufacturer in Italy which had contracted to supply goods in New York. Rejecting the argument that the manufacturer had no control over the ultimate destination of the goods and was therefore was not subject to jurisdiction in New York, the court said that

> we do not believe the New York State legislature intended to allow potential defendants to escape the reach of the long arm statute by inserting such terms into their contracts. Although risk of loss may have passed in Milan, it does not alter the practical reality that [the manufacturer] contracted to supply, and did in fact ship, goods into New York. This activity places this case squarely within § 302(a)(1).

*Id.* at 1258.

A similar result was reached in *Cavalier Label Co. v. Polytam, Ltd.*, 687 F.Supp.

872 (S.D.N.Y.1988). In that case, a New York clothing importer and wholesaler had sued an Israeli manufacturer of sportswear for breach of contract and fraud. Although the court found it doubtful that the defendant's contacts with New York met the transaction-of-business test, the court held that the part of § 302(a)(1) dealing with contracting out of state for the supply of goods or services in New York provided a basis for personal jurisdiction. The court observed that the defendant "was well aware that the coats it produced were destined for New York. The fact that the coats were sent F.O.B. Israel does not alter the result." The court concluded that although risk of loss may have passed in Israel, as a practical matter the manufacturer had contracted to ship goods into New York. *Id.* at 877.

For jurisdiction to exist under § 302(a)(1), however, the cause of action must "arise under" the acts enumerated in the statute, *i.e.*, the contracting to supply goods in New York. Obviously, GB's breach-of-contract claim meets this test.

The requirement that the claim arise under the contract, though, does not mean that the cause of action must be for breach of contract. "[A]ll that is required is that the claim be 'a direct consequence of purposeful New York activity and the benefits and protections of New York law have been utilized' by the defendant." N.Y.C.P.L.R. § 302 Practice Commentary C302:13 (McKinney 1990), *quoting Tonns v. Spiegel's*, 90 A.D.2d 548, 550, 455 N.Y.S.2d 125 (1982).

The copyright claim here does arise out of Gerolsteiner's allegedly contracting to sell water in New York. This claim may not involve the same contract as that which forms the basis of the breach-of-contract claim. The latter arises out of an alleged contract between GB and defendants Gerolsteiner and Miller. The copyright claim, on the other hand, arises out of Gerolsteiner's allegedly infringing sales here pursuant to Gerolsteiner's contracts with Miller and Stockmeyer. Certainly, though, both this

claim and the contract claim arise out of contracts to provide goods within New York.

■ The same cannot be said for the remaining claims, however. These three claims—sounding in promissory estoppel, quantum meruit, and unjust enrichment—are quasi-contractual in nature, and as such, they presume that there was no actual contract.[3] Therefore, jurisdiction over these claims can only exist under the transaction-of-business test of § 302(a)(1).

GB has alleged a number of acts on Gerolsteiner's part which GB claims amount to the transaction of business in New York. In summary, the acts are as follows: Gerolsteiner's procurement of permits to sell water in New York; Gerolsteiner's shipment of water directly to New York customers; Gerolsteiner representatives' attendance at trade shows in New York City, and their contemporaneous meetings with Gauntlett; Gerolsteiner's participation in marketing the water in New York; and Gerolsteiner's correspondence with GB in New York.

Gerolsteiner admits some of these alleged activities, and denies others. For example, Gerolsteiner concedes that it sent people to New York in 1989 and 1990 to meet with Miller's customers (including Gauntlett) and to attend trade shows. Gerolsteiner also admits obtaining permits from New York State and New York City allowing the sale of Gerolsteiner Sprudel within those jurisdictions. However, Gerolsteiner contends that it only attended the trade shows as an observer, and denies that it had any substantive discussions with Gauntlett during its visits. Gerolsteiner also contends that the permits were really for the benefit of GB, which was the actual seller of the water in New York.

■ Considerably less is required to establish that a defendant "transacts business" in New York than to show that it does business under N.Y.C.P.L.R. § 301. *Hoffritz, supra,* 763 F.2d 55. However, as

with contracting to supply goods within the state, transacting business here will not support jurisdiction unless the claim arises from the business transacted. *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), *cert. denied sub nom. Estwing Mfg. Co. v. Singer,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). Transacting business, then, "requires only a minimal quantity of activity, provided that it is of the right nature and quality." *Manhattan Life Ins. v. A.J. Stratton Syndicate,* 731 F.Supp. 587 (S.D.N.Y.1990).

■ Although a single purposeful act in New York can suffice to confer jurisdiction in New York over a claim arising out of that act, *Longines,* 15 N.Y.2d at 456, 261 N.Y.S.2d 8, 209 N.E.2d 68, the court need not find that any one act gives rise to jurisdiction. Instead, the court must consider the quantity and composite quality of the defendant's actions in the aggregate. *Id.; George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 651, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977).

After reviewing the affidavits and exhibits, I find that plaintiff has met its burden at this stage of establishing personal jurisdiction on claims 2, 3 and 4. Although no one of the acts alleged by plaintiff, standing alone, would necessarily support jurisdiction, I believe that they collectively demonstrate that Gerolsteiner has transacted business in New York which gave rise to these claims.

The record shows that despite Gerolsteiner's claims that it completely relinquishes control over the water in Germany, it has in fact engaged in purposeful activity in New York aimed at developing its market in New York. During the time that GB was the distributor, that activity necessarily included maintaining good relations with GB, regardless of whether Gerolsteiner and GB ever actually had a contract.

■ For instance, Gerolsteiner took steps to obtain New York permits for the

---

**3.** Gerolsteiner's contracts, if any, with Miller and Stockmeyer cannot support jurisdiction over these claims, since the claims do not arise

out of those contracts, but out of GB's business relationship with Gerolsteiner and Miller.

sale of the water. Even if the applications were sent to Gerolsteiner by Miller, Gerolsteiner could not have been wholly disinterested in whether the permits were granted. In addition, although Gerolsteiner contends that Miller acted as a go-between during the application process, Gerolsteiner on at least one occasion did communicate directly with the New York City Department of Health; *see* Gauntlett Affidavit, 7/17/91, Ex. G. Finally, the permits were issued to Gerolsteiner, not to Miller; *see id.*, Ex. F. A non-domiciliary corporation's efforts to comply with governmental requirements for doing business here are some indication of the corporation's intent to avail itself of the privilege of transacting business in New York. *Cf. Wichita Federal Savings & Loan v. Comark*, 586 F.Supp. 940 (S.D.N.Y.1984) (defendant's filing of certificate of authority to do business in New York evidenced its intent to transact business here).

Gerolsteiner also admits that its representatives met Gauntlett at two trade shows in New York in 1989 and 1990. *See* Affidavit of Hans–Jürgen Mertes ¶ 10. Gerolsteiner disputes Gauntlett's allegations that part of Gerolsteiner's purpose in attending these shows was to promote the sale of the water in the United States and to discuss the marketing of the water with Miller. Gerolsteiner also disputes Gauntlett's claim that he and Gerolsteiner's export manager, Reinhard Brenner, discussed various aspects of GB's relationship with Gerolsteiner and Miller at the 1990 show.

I do not accept Gerolsteiner's arguments in this regard, for several reasons. First, for purposes of this motion, plaintiff's allegations must be taken as true. *Hoffritz*, 763 F.2d at 57; *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 at 904 (1981); *see also Catsimatidis v. Innovative Travel Group, Inc.*, 650 F.Supp. 748 (S.D.N.Y. 1986) (accepting for purposes of jurisdictional issue plaintiff's account of what was discussed between parties at New York meeting).

Second, I find less than credible Gerolsteiner's allegations that its representatives attended the shows solely as spectators and that there were no business discussions between them and Gauntlett. While the former assertion may be true in the sense that Gerolsteiner did not actually have a booth at the shows, it is unlikely that the Gerolsteiner personnel came to the shows and met with Miller and GB purely for pleasure. As the Second Circuit has observed, "few business discussions can be characterized as entirely social." *Cutco Indus. v. Naughton*, 806 F.2d 361, 367 (2d Cir.1986). Moreover, "[m]eetings which are partially social in nature, as well as meetings which merely create the likelihood of a more solid business relationship are a sufficient basis for the exercise of in personam jurisdiction." *Interface Biomedical Lab. v. Axiom Medical*, 600 F.Supp. 731, 737 (E.D.N.Y.1985); *Round One Productions Inc. v. Greg Page Enterprises, Inc.*, 566 F.Supp. 934, 937–38 (E.D.N.Y. 1982).

The presence at these shows of Gerolsteiner representatives was certainly motivated by some business considerations. It may be, as Gerolsteiner claims, that Brenner and Gauntlett did not discuss a possible contract between their respective companies at their meeting.[4] Nevertheless, it could certainly be said that these meetings "created the likelihood of a more solid business relationship" among GB, Miller, and Gerolsteiner.

Further support for this finding is found in a letter from Brenner to Gauntlett dated April 30, 1990 (roughly seven months before the meeting at the food show). In that letter, Brenner stated, "We all in Gerolstein who are responsible for this area are very interested in cooperating with you and your wife on a long term basis." Brenner also stated that "With GB–Marketing . . . you are in indirect business con-

---

**4.** I note, however, that Gerolsteiner's support for this claim is the affidavit of Jens Saggau, president of Miller, who states only that "I am aware of no discussions" between Brenner and Gauntlett concerning a contract. Saggau Affi-davit ¶ 12. Even if the court were not to resolve doubts on this motion in plaintiff's favor, this would not be sufficient to rebut Gauntlett's allegation that he did have such discussions with Brenner.

tact to Gerolsteiner." Gauntlett Affidavit, 7/17/91, Ex. P. This is some evidence that the subsequent meeting in New York was at least partially intended to strengthen the relationship (albeit an indirect one) between Gerolsteiner and GB.[5]

Gerolsteiner's shipment of water to New York, and its shipment of complimentary glasses to GB as promotional items, without more, would not support jurisdiction over these claims. Since these are not contract claims, this activity would not fall under the provision for contracting to supply goods within New York, and must be analyzed under the transaction-of-business test. Such an analysis would in effect be the same as applying § 302(a)(1) prior to the 1979 amendment which abrogated the "mere shipment" rule. As to these claims, then, it would remain the rule that the mere shipment of goods does not confer jurisdiction.

However, that does not mean that the shipment of goods is irrelevant. The rule refers to the *mere* shipment of goods, but plaintiff here alleges more than that. Gerolsteiner's alleged shipments formed a part of a pattern of business activity that included dealing with GB. Since I must consider Gerolsteiner's actions as a whole, *Reiner,* 41 N.Y.2d at 651, 394 N.Y.S.2d 844, 363 N.E.2d 551, I find that this activity does add some weight to the showing that Gerolsteiner transacted business here.

Gerolsteiner also admits that it reimbursed Miller for advertising activities undertaken by GB. Mertes Affidavit ¶ 11. Again, although in itself this might not support jurisdiction, it adds to the evidence that Gerolsteiner had a hand in GB's sales in New York, even if only indirectly.

I do not believe that the fact that funds and communication between Gerolsteiner and GB had to pass through Miller first can totally insulate Gerolsteiner from long-arm jurisdiction. This is particularly so in view of the evidence that Miller was at times simply a relayer of messages between Ger-

olsteiner and GB; for example, an April 25, 1990 fax from Miller to Gauntlett cautions Gauntlett not to make certain commitments to his customers without first obtaining confirmation from Miller, the reason being that "Each and every decision in the end has to be made by Gerolsteiner." Gauntlett Affidavit, 7/17/91, Ex. O.

Viewed together, then, Gerolsteiner's alleged activities suffice to create a prima facie showing that Gerolsteiner transacted business in New York. In addition, I do not accept Gerolsteiner's arguments that these activities have no nexus to claims 2 through 4, for Gerolsteiner takes too narrow a view of the activities in question. The claims may not arise directly out of the New York State and City permits, or out of New York advertising, or out of any one of the other acts alleged. The point, however, is that the combined effect of these activities was, allegedly, to create a potentially long-lasting business relationship between GB and Gerolsteiner, pursuant to which GB undertook to promote the sale of Gerolsteiner's product. It is out of that relationship that these claims arise.

■ The fact that some of the jurisdictional allegations are in dispute does not present an obstacle to the court's ruling on this issue. A court faced with such a dispute has several options: it may decide the motion based on affidavits; it may permit discovery relating to the jurisdictional facts; or it may hold an evidentiary hearing. *Hoffritz, supra,* 763 F.2d at 57; *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). "If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need only make a prima facie showing of jurisdiction," and all pleadings and affidavits are construed in the light most favorable to plaintiff. *Hoffritz,* 763 F.2d at 57; *Miller,* 664 F.2d at 904; *Visual Sciences, Inc. v. Integrated Communications, Inc.,* 660 F.2d 56, 58 (2d Cir.1981).

**5.** The court's discussion of this letter is not meant to express any view on the ultimate merits of GB's claims, and I recognize that the letter goes on to state that GB "should complete a

contract with Miller" rather than with Gerolsteiner. As stated, though, on this jurisdictional issue all inferences from the facts are to be drawn in plaintiff's favor.

In the case at bar, I do not believe that a hearing is necessary. A careful examination of the affidavits submitted by both sides shows that the parties' versions of the jurisdictional facts are not as divergent as they might at first appear. For the most part, the differences between them arise from the gloss that each side attempts to put on the facts.[6] To the extent that there are differences between their accounts, it seems unlikely that a hearing would shed much additional light on the issues. Furthermore, I find that even the undisputed facts here demonstrate that Gerolsteiner's activities in New York amounted to the transaction of business under N.Y.C.P.L.R. § 302(a)(1).

### 2. Subject Matter Jurisdiction Over the Copyright Claim

■ Gerolsteiner alleges that the court lacks subject matter jurisdiction over the copyright claim as to Gerolsteiner because its alleged infringing activities all occurred outside the United States. Gerolsteiner notes that the complaint alleges that the labels are put on the bottles by Gerolsteiner in Germany.

GB agrees that there is no jurisdiction if the infringing actions occurred *entirely* outside the United States. GB argues, however, that defendants have distributed the water with the infringing labels in this country. GB contends that Gerolsteiner contributed to the infringement by affixing the labels, which were clearly designed for the American market, at Gerolsteiner's plant in Germany.

■ "It is well established that copyright laws generally do not have extraterritorial application." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir.1988). Where copyright infringement occurs both inside and outside the United States, the district court has jurisdiction, but only over the U.S. infringement. *Id.*

An analysis of the copyright statute demonstrates that subject matter jurisdiction does exist in this case. Section 106 of Title 17 grants the owner of a copyright the exclusive rights "to do and to authorize" certain acts, among which are the reproduction and distribution of the copyrighted work. The distribution right includes the right to import copies of the work. 17 U.S.C. § 602(a); 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.11[B] (1990).

Congress's use of the phrase "to authorize" was intended to establish the liability of a "contributory infringer," which is a person "who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 61 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News pp. 5659, 5674; *Gershwin Publishing Corp. v. Columbia Artists Mgt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971).

■ Infringement, then, may be either direct (*e.g.*, actual distribution of the work), or contributory. Title 17 U.S.C. § 501 also makes this clear, since it defines a copyright "infringer" as "[a]nyone who violates any of the exclusive rights of the copyright owner ..." Since one of those rights is the right to authorize importation, then, one who knowingly induces, causes, or contributes to the importation of a copyrighted work may be liable as a contributory infringer.

In the case at bar, Gerolsteiner's alleged activities include both direct and contributory infringement. Gerolsteiner's alleged

6. For example, there is a dispute concerning GB's contention that Gerolsteiner sometimes shipped its water directly to customers in New York. However, the real disagreement is less about the facts than about which facts are significant. Gerolsteiner argues that it did not ship directly to New York customers because title to the water passed to Miller in Germany. GB argues that transfer of title is irrelevant, because physically the product was shipped directly from Gerolsteiner's factory to New York.

The disputes over the permits are similar. All parties admit that the permits were issued; the chief dispute is about whether the permits were primarily for GB's benefit or that of Gerolsteiner. It is clear, though, that the permits worked to the benefit of everyone in the chain of distribution, including both Gerolsteiner and GB, since both parties had an interest in ensuring that the water could be sold in New York.

labeling and sale of the bottles to Miller would (assuming the copyright to be valid) constitute a direct infringement of GB's reproduction and distribution rights. That act in itself would not confer subject matter jurisdiction over Gerolsteiner, however, because it occurred in Germany.

However, the court cannot ignore the fact that Gerolsteiner is alleged to have sold the bottles to Miller with the knowledge and intent that the water would then be exported to the United States and sold here. Gerolsteiner is also alleged to have specifically prepared the bottles for the American market in various ways, such as the manner in which they were packed for shipment. These allegations, if true, would support a claim of contributory infringement arising out of the importation of the water into this country. *See, e.g., Encyclopedia Britannica Educational Corp. v. Crooks*, 558 F.Supp. 1247 (W.D.N.Y.1983) (defendant who furnishes videotapes to another for purposes of public performance is liable as contributory infringer).

I find that subject matter jurisdiction exists over Gerolsteiner. Although Gerolsteiner's acts concerning the label physically occurred in Germany, the policies underlying the nonextraterritoriality rule support upholding jurisdiction over Gerolsteiner. In *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909), an antitrust case, Justice Holmes, writing for a unanimous Court, explained that non-extraterritoriality is premised upon the principle that it would be both unjust and an interference with the authority of another sovereign for a given jurisdiction, "if it should happen to lay hold of the actor, to treat him according to its notions rather than those of the place where he did the acts ..."

That reasoning, however, has not been universally applied. In another antitrust case, the court in *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 869 (10th Cir. 1981), *cert. denied*, 455 U.S. 1001, 102 S.Ct. 1634, 71 L.Ed.2d 868 (1982), observing that cases subsequent to *American Banana* had "severely limited its application," stated that "[i]f American interests are at stake we may impose liability for conduct outside our borders that has consequences within our borders." In criminal law, there exists the analogous rule that a state may punish a person who commits an extraterritorial act which is intended to have an effect within the state. *See Strassheim v. Daily*, 221 U.S. 280, 284–85, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); *United States v. Columba-Colella*, 604 F.2d 356, 358–59 (5th Cir.1979).

The general principle expressed in these cases, then, is that it is unfair to hold a person liable under the laws of this nation for acts done abroad, except when those acts are intended to, and do, have an effect within the United States. Applying this principle to copyright cases, the court holds that when a foreign corporation is alleged to have purposefully injected itself into the American market by shipping infringing goods here—regardless of whether it does so directly or through an importer—the defendant should not be allowed to use the principle of non-extraterritoriality to shield itself from the reach of American courts and American copyright law. *See* Nimmer, *supra* § 12.04[A][3][b]; *see also Danjag, S.A. v. MGM/UA Communications Co.*, 773 F.Supp. 194, 203 (C.D.Cal. 1991) (court looks to location of acts authorized by defendant, not to where authorization occurred, in determining whether authorization is actionable in United States court).

In deciding this issue, then, the court does not limit its inquiry to a purely mechanical examination of where Gerolsteiner's acts physically took place. In fact, it is precisely because the copyright statutes are aimed at infringement in the United States that the court must also consider the location of the *effect* of Gerolsteiner's alleged actions, *i.e.*, the location of the ultimate direct infringement. *See Danjag*, at 203.

I conclude, therefore, that because Gerolsteiner is alleged to have contributed to, or authorized, a direct infringement which occurred in the United States, Gerolsteiner's alleged actions give rise to subject matter jurisdiction.

### 3. Failure to State a Claim for Copyright Infringement

■ Defendants assert that they are entitled to summary judgment on the copyright claim on the following grounds: Gauntlett's copyright is invalid because Gauntlett made misrepresentations on the registration form; Gauntlett's design is so derivative of Gerolsteiner's previous labels that it cannot support a copyright; and the current label does not infringe on the copyright because the current label does not contain the words "Rich in Calcium," which defendants claim was Gauntlett's only original contribution to the copyrighted label.

GB denies that Gauntlett misled the Copyright Office, and that the failure to register the label as a derivative work does not invalidate the copyright. GB also contends that Gauntlett's design was original enough to support a copyright, and that it was not merely a copy of Gerolsteiner's old labels.

■ "The elements of a copyright infringement action are (1) ownership of a valid copyright and (2) copying by the alleged infringer." *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452, 455 (2d Cir.1989). The plaintiff's possession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable. *Id.* While that presumption generally is not overcome by an "innocent misstatement" on the registration form, it may be overcome by proof of a deliberate misrepresentation. *Id.* Thus, in *Whimsicality* the court held that the plaintiff did not have a valid copyright in certain costumes (which, as apparel, constituted "useful articles," and hence were not copyrightable) because the plaintiff had misrepresented them to the Copyright Office as "soft sculpture."

Clearly the label and carton which are the subject of plaintiff's copyrights in the case at bar are not original in every detail, since they make use of preexisting Gerolsteiner trademarks and logos. Gauntlett was obviously aware of those preexisting images, since they were present on the Gerolsteiner label which Gauntlett found unsatisfactory. On the other hand, Gauntlett's label is not identical to any of the preexisting labels, none of which utilize exactly the same configuration of words and images that Gauntlett's does.

While the precise arrangement of the words and images may have been Gauntlett's, then, the use of the same typeface, colors, and images puts it beyond question that the label was derived from Gerolsteiner's earlier labels. If Gauntlett's label were copyrightable at all, therefore, it was only so as a "derivative work," which is defined in 17 U.S.C. § 101 as a work "based upon one or more preexisting works," but which "as a whole, represent[s] an original work of authorship ..." Such a work may be copyrighted, but "copyright protection extends only to the new material contributed to the prior work." *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 985 (S.D.N.Y.1980); *see* 17 U.S.C. § 103(b).

■ Gauntlett, however, failed to disclose on the registration form that he had made use of elements that were not of his own creation. It is true, as plaintiff states, that the fact that a derivative design is not registered as such does not automatically invalidate the registration. *JBJ Fabrics, Inc. v. Brylane, Inc.*, 714 F.Supp. 107 (S.D.N.Y.1989). The determinative factor is whether the omission occurred knowingly. *Id.* at 109. Although an innocent misstatement or technical omission will not invalidate a copyright registration, a "'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action ... or denying enforcement on the ground of unclean hands.'" *Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir.1984), *quoting Russ Berrie*, 482 F.Supp. at 988.

The rationale behind this rule is simple: although the court would ordinarily defer to the judgment of the Copyright Office when the question of originality is a close one, that is impossible to do when the Copyright Office has not had a fair opportunity to pass on the question because of

the copyright claimant's failure to advise the Office of the existence of a prior work. *Past Pluto Productions Corp. v. Dana*, 627 F.Supp. 1435, 1440 n. 5 (S.D.N.Y.1986); *Russ Berrie*, 482 F.Supp. at 987.

██  The seriousness of the omission on the registration in this case is heightened by the fact that the copyright was for a label. The reason for this is that to be copyrightable, labels require a higher degree of originality than other writings. 1 Nimmer, *supra* § 2.08[G][2]. In *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir.1959), the Second Circuit described as "a fair summary of the law" an excerpt from a Copyright Office publication which stated that "Brand names, trade names, slogans, and other short phrases or expressions cannot be copyrighted, *even if they are distinctively arranged or printed*" (emphasis added). One commentator concludes that "to whatever limited extent textual material on labels may be protected, pictorial illustrations and designs constitute the primary subject matter for label protection." 1 Nimmer, *supra*, § 2.08[G][2].

Here, of course, the only pictorial illustrations on the copyrighted label were the medallions and the lion-and-star logo, which Gauntlett admits were not his creations. Gauntlett Affidavit, 10/10/91, ¶¶ 22, 23. Given the limited copyrightability of labels in general, plaintiff's failure to disclose the derivative nature of the Gauntlett label, and the consequent inability of the Copyright Office to make an informed decision on the application, is particularly serious.[7]

Because issues concerning omissions or misstatements on a copyright registration involve the copyright registrant's intent or knowledge, summary judgment is often inappropriate. *JBJ Fabrics*, 714 F.Supp. at 109. However, after reviewing the materials submitted both in support of and in opposition to defendants' motion, I find that no genuine factual issue exists as to plaintiff's knowledge that the space on the registration form dealing with derivative or collective works was left blank.

Defendants have alleged that plaintiff deliberately chose not to inform the Copyright Office of the prior Gerolsteiner labels or logos. In support of their motion, defendants point to the registration forms, the earlier Gerolsteiner labels, and correspondence between Gauntlett and Saggau indicating that Gauntlett was aware of at least one such label, and that he received some directions from Gerolsteiner through Saggau about what type of design they would consider acceptable.

Faced with these allegations on a motion for summary judgment, plaintiff has the burden of going beyond the pleadings, and by reference to affidavits, depositions, or answers to interrogatories, designating specific facts which show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, such a showing is conspicuously absent here. In Gauntlett's October 10, 1991 affidavit, he states simply that "the registrations speak for themselves ..." He also admits that he did not create the Gerolsteiner medallions or the lion-and-star logo. As to the preexisting Gerolsteiner labels, Gauntlett alleges that he did not see some of them until after the commencement of this action; he does, however, admit to having been aware of some labels when he copyrighted his label, and he expresses uncertainty over when he first saw some others. *See, e.g.*, Gauntlett Affidavit, ¶¶ 27, 34, 36.

I find that plaintiff's complete failure to explain why the registration form did not disclose the prior Gerolsteiner labels, coupled with Gauntlett's admission that he had

---

**7.** The same holds true for the four-pack wrapper. The wrapper itself, apart from the printing on it, would presumably be a non-copyrightable "useful article," 17 U.S.C. § 101, and indeed Gauntlett's registration only claimed a copyright in "some text." The text and images, though, serve essentially the same purpose on the wrapper that they do on the label: to identify the product and attract consumers. Thus, they are neither more nor less copyrightable on the wrapper than on the label. The failure to advise the Copyright Office that some of the text may have been borrowed from Gerolsteiner labels, then, has the same ramifications as to the wrapper that it does as to the label.

seen some of those labels, and that he made use of Gerolsteiner logos which he had not created, is insufficient to show the existence of a genuine issue of material fact. It is not enough for GB merely to assert that there is an issue of fact; plaintiff "must do more than simply show that there is some metaphysical doubt as to the underlying facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Under these circumstances, the prima facie case established by submission of GB's copyright registration has been successfully rebutted by defendants. The court therefore declines to enforce the copyright. *See Russ Berrie,* 482 F.Supp. at 987 (copyright not enforced, since plaintiff's explanation for his failure to disclose pre-existing work to Copyright Office was not credible); *see also Harrison–Erickson, Inc. v. Chicago Bulls Limited Partnership,* No. 91 Civ. 1585, 1991 WL 51118, *5–6, 1991 U.S. Dist. LEXIS 4010, *16–17, (S.D.N.Y. April 3, 1991) ("serious questions" as to whether plaintiff's failure to mention preexisting work when registering copyright was inadvertent and innocent rebutted presumption of validity of plaintiff's copyright); *cf. Original Appalachian Artworks, Inc. v. Cradle Creations, Inc.,* 223 U.S.P.Q. 80, 1983 WL 669 (N.D.Ga.1983) (plaintiff's copyright was not unenforceable due to failure to complete question six on registration, since there was no evidence of intentional concealment of relevant information, especially in light of the fact that copyrighted work was based on *previous works designed by plaintiff* rather than on works of unrelated third party).

Although my decision on this cause of action rests primarily on my finding that the copyright is unenforceable, I also note that the circumstances under which Gauntlett obtained permission from defendants to register the copyright calls into question the validity of this claim. In repeatedly asking for Gerolsteiner's permission, and in assuring defendants that he had "no interest in tying up this label for [his] personal benefit," but that he only wanted to protect the label for the benefit of all concerned, Gauntlett in effect represented to defendants that he wished to register the label as their agent. An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *In re Shulman Transport Enterprises, Inc.,* 744 F.2d 293, 295 (2d Cir.1984), *quoting* Restatement (Second) of Agency § 1(1) (1958). Gauntlett here certainly made it appear that he would be registering the copyright only with the consent of Gerolsteiner and Miller, and that he only had their interests in mind.

In creating such a fiduciary relationship, however, Gauntlett assumed certain obligations, one of which was that he not obtain any interest adverse to defendants, at least without making full disclosure to them of any such interest. *Laundau v. Percacciolo,* 66 A.D.2d 80, 87, 412 N.Y.S.2d 378 (1979), *aff'd,* 50 N.Y.2d 430, 429 N.Y.S.2d 566, 407 N.E.2d 412 (1980). While defendants may have known that the copyright was being registered in GB's name, it does not appear that Gauntlett revealed that he would claim a copyright in the "entire text and artwork," including the parts that were derived from Gerolsteiner's previous labels. Furthermore, Gauntlett was at pains to downplay the possibility that he would acquire any interest adverse to defendants, and stated that he had "no interest" in interfering with defendants' use of the label.

The law permits "no abuse of special opportunities growing out of a special trust as manager or agent." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 995 (2d Cir.1983). In the case at bar, Gauntlett obtained the trust of defendants, and was therefore given the opportunity to obtain for GB a copyright in the label. Plaintiff's attempt to use that copyright as a sword against defendants, rather than the shield that Gauntlett assured them it would be, constitutes an abuse of that opportunity.

I conclude, then, that defendants are entitled to summary judgment on plaintiff's

first claim. My decision on this issue renders it unnecessary for me to decide whether plaintiff's label was sufficiently original to support a copyright, or whether Gerolsteiner's current labels infringe on GB's copyright.

### 4. Venue/Statute of Frauds

■ Defendants move to dismiss claims 2 through 5 for improper venue. Defendants argue that these claims are essentially contractual in nature, and that the only way GB can bring these claims is by attempting to enforce certain draft contracts between GB and Miller, all of which, defendants allege, set venue in Germany.

GB contends that since these were only draft agreements which were never executed by the parties, the forum selection clauses are unenforceable. Defendants' response is that if GB is alleging an oral contract, the contract would be invalid under the Statute of Frauds, because it was entered into in 1988 and was allegedly breached in 1991.

I am not persuaded by defendants' arguments insofar as they relate to claims 2, 3, and 4. For one thing, defendants' characterization of these causes of action as the "contract claims" is something of a misnomer. While the fifth claim is indeed for breach of contract, it is pleaded as an alternative to the theories presented in the second, third, and fourth claims, which are based on promissory estoppel, quantum meruit, and unjust enrichment respectively. These quasi-contractual claims do not depend on—indeed, they would in some respects be inconsistent with—the existence of an actual contract, whether written or oral. *See City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988) (quasi-contractual relief not available when express contract covers subject matter).

■ I do have some doubts about whether plaintiff's contract claim is actionable under the Statute of Frauds, although not for the reason advanced by defendants. The fact that an alleged oral contract in fact lasted more than one year does not mean that it violated the Statute of Frauds, so long as nothing in its terms barred performance within a year. *See, e.g., Greybark Advertising v. Amba Marketing Systems*, 473 F.Supp. 285, 287 (S.D.N.Y.1979); *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 265, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977).

Under New York law, however, a service contract of indefinite duration, in which one party agrees to procure customers or accounts or orders on behalf of a second party, is not by its terms performable, within one year—and hence must be in writing—since performance is dependent, not upon the will of the parties to the contract, but upon that of a third party [*i.e.*, the customer].

*Paper Corp. of U.S. v. Schoeller Technical Papers*, 724 F.Supp. 110, 115 (S.D.N.Y. 1989); *D & N Boening, Inc. v. Kirsch Beverages*, 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984); *Zupan v. Blumberg*, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E.2d 819 (1957); *McCollester v. Chisholm*, 104 A.D.2d 361, 478 N.Y.S.2d 691 (1984), *aff'd*, 65 N.Y.2d 891, 493 N.Y.S.2d 310, 482 N.E.2d 1226 (1985).

That is essentially the kind of contract alleged here; the complaint says that "all parties agreed that plaintiff was and would remain the *long-term* exclusive United States distributor of Gerolsteiner Sprudel" (emphasis added). Plaintiff also alleges that GB sought out customers and built up a market for defendants. The contract thus apparently contained "no provision under which 'either party might rightfully terminate it within the year [of its making].'" *D & N Boening*, 63 N.Y.2d at 457, 483 N.Y.S.2d 164, 472 N.E.2d 992, *quoting Blake v. Voigt*, 134 N.Y. 69, 72, 31 N.E. 256 (1892) (brackets in original).

GB has not alleged the existence of any written contract. GB expressly disavows any desire to enforce those agreements, and there seems to be no dispute that they were never signed by the parties.

■ Despite my serious doubts about the contract claim, however, I am not prepared to dismiss it at this point. A case may be taken out of the Statute of Frauds by writings memorializing the agreement;

*see, e.g., Del Monte Corp. v. Mercantum (U.S.) Corp.,* 572 N.Y.S.2d 678, 680 (App. Div.1991); *cf. United Beer Distributing v. Hiram Walker,* 163 A.D.2d 79, 557 N.Y.S.2d 336 (1990). There are some copies of writings between the parties in the record, but some of them are only excerpts, and it is not clear if any others exist. The parties have not ·addressed the Statute of Frauds issue at any length, and the writings that are in the record were generally submitted in connection with the copyright and jurisdictional issues. Discovery between the parties is obviously not complete.

In light of these facts, and since the case is still in its early stages, it would be premature to rule on the validity of the contract cause of action relative the Statute of Frauds defense. Moreover, defendants' motion as to this claim is actually styled a motion to dismiss for improper venue. I do not consider it advisable to go outside the pleadings when it is not clear if the record is complete, and to rule on this cause of action on a different ground from the one actually asserted by defendants.

### CONCLUSION

For the reasons given, it is hereby

ORDERED, that defendants' motion for summary judgment on plaintiff's first cause of action is granted, and that cause of action is dismissed; and it is further

ORDERED, that defendants' motion to dismiss plaintiff's second, third, fourth, and fifth causes of action is denied.

IT IS SO ORDERED.