OVERHEAD DOOR CORPORATION and
Overhead Door Company of Georgia,
Inc., Plaintiffs,

v.

Coral B. NATHANSON and Overhead
Door Co. of Charlotte, Inc.,
Defendants.

Civ. A. No. 2363.

United States District Court
W. D. North Carolina,
Charlotte Division.

Oct. 14, 1968.

Egbert L. Haywood, George W. Miller, Jr., Haywood, Denny & Miller, Durham, N. C., for plaintiffs.

J. Marshall Haywood, Charlotte, N. C., for defendants.

MEMORANDUM OF DECISION

McMILLAN, District Judge.

The plaintiffs manufacture and advertise overhead doors (such as garage doors which slide upward and along the ceiling of buildings). For many years Harry Nathanson, doing business as Overhead Door Co. of Charlotte, was the distributor in the Charlotte area for the products of the plaintiffs. At least as

early as June 15, 1955 Nathanson as distributor made a written contract with one of the plaintiffs containing the essentials of the restrictive covenants which are the subject of this action.

About 1960 Nathanson incorporated his business, without notice to the plaintiffs. The plaintiffs thereupon entered into a 1960 distributor's agreement with the new corporation of which Nathanson was president. The agreement was substantially identical with the one previously existing between the plaintiffs and Nathanson as an individual.

The agreement was re-executed in revised form in 1965. In paragraph 17 of the Standard Provisions of both the 1960 and the 1965 editions, it provided that upon termination of the distributorship the corporate defendant would:

"(b) discontinue the use of the distributor's name and the use of the Marks, including without limitation the trade names "OVERHEAD DOOR" and "OVERHEAD", except with respect to the Marks actually attached to the Company's products which the Distributor may at the time have on hand and which it acquired under the terms and conditions of the Distributor's Agreement, and execute all assignments and other instruments which in the opinion of the Company may be necessary or advisable in order effectively to transfer to the Company all rights which the Distributor may have in respect of the use of the name authorized by the Distributor's Agreement to be used by the Distributor and the Marks, including, without limitation the trade names "OVERHEAD DOOR" and "OVERHEAD";

\* \* \* \* \* \*

"(d) advise the telephone company or companies in the Franchised Area in writing that the telephone numbers used in connection with his business and franchise under the Distributor's Agreement are to be retained by the Company or subject to the Company's direction for use by others; and

"(e) sell to the Company, or to others whom the Company may nominate if the Company in its sole discretion desires to purchase the same, all or any part of the Company's products then in the hands of the Distributor and not covered by a customer's signed order to the Distributor at the Company's distributor's net prices in effect at that time or at the Distributor's purchase price thereof, not including freight, whichever may be higher."

During the periods of operation under the various forms of agreement, first Nathanson and, later, his corporation made substantial sales of plaintiffs' merchandise. The plaintiffs advertised the products nationally under the trade names "OVERHEAD DOOR" and "OVERHEAD." Although it is not particularly material to this decision, the plaintiffs had a trademark consisting of a ribbon banner with the words "OVERHEAD DOOR" written on it. This trademark was registered with the Secretary of State of North Carolina.

Harry Nathanson died July 1, 1967 leaving to his wife, Mrs. Coral B. Nathanson, a controlling stock interest in the defendant corporation. The plaintiffs sought to continue the dealership through Mrs. Nathanson and her son, Lewis Nathanson, but Mrs. Nathanson and Lewis Nathanson could not agree upon the management of the business. The plaintiffs cancelled the distributorship agreement on May 3, 1968, and established Lewis Nathanson, the son (and a corporation in which he is interested called C & N Corporation) as local distributor.

Since May 3, 1968, the corporate defendant has kept on doing business at the same old stand, selling and advertising overhead doors as theretofore, and making no change in the telephone arrangements, all contrary to the contract. Confusion of customers and damage to plaintiffs' business has occurred.

There was at the hearing a controversy over the repurchase by the plaintiffs under § 17 (e) of the agreement of the

old stock of doors and supplies which the defendant corporation had on hand. That problem was resolved pursuant to the Court's order of August 16, 1968, which allowed the plaintiffs substantially the relief sought pending trial on the merits, provided the plaintiffs would elect to repurchase the old stock on the contract terms. That election was made; the corporate defendant did elect to sell the stock; and the sale has now been consummated without prejudice to the rights of any party to pursue the questions presented by this litigation.

The question is whether to continue the temporary restraining order of August 16, 1968 until a final trial on the merits.

As to Mrs. Coral B. Nathanson, no showing has been made why she, individually, should be subject to any restraint based upon the previous agreements between her husband individually and the plaintiffs or between the corporate defendant and the plaintiffs. The motion for a temporary restraining order as to Mrs. Nathanson individually is denied.

■ The corporate defendant has a different set of obligations. Those obligations, on this record, do not depend upon any common law property rights of the plaintiffs in the word "OVER-HEAD" or in the use of the words "OVERHEAD DOOR." There is too much contrary evidence in the affidavits in the file and in the Charlotte telephone book to entertain seriously the thought that the plaintiffs have a common law monopoly of those terms or that the plaintiffs could require others to erase those words from their vernacular *in the absence of some special contract.* The terms, although used by the plaintiffs, are used by many others also; they do not on this record appear to have a secondary meaning peculiar to the plaintiffs' business; and the plaintiffs' right to equitable restraint, if any, has to depend upon something else.

That "something else," in the form of the contract, exists.

■ Courts ought to seek to uphold contracts unless some compelling reason of policy or some over-reaching or fraud indicates otherwise. The enforcement of contracts has much to do with justice and with law and order—perhaps as much as the prevention of burglary, the control of riots and the protection of constitutional rights. Contracts may be upheld by specific performance, by award of damages, or by both.

■ This contract was between mature adults and business corporations; its restrictions are limited to those reasonably necessary to protect the legitimate business interests of plaintiffs; it does not restrict any individual in his livelihood or movements or freedom of occupation; it does not require even the corporate defendant to go out of business; it is supported by valuable consideration—many years of exclusive and valuable distributorship in a populous fifteen-county area of the Carolinas; it recognizes (as between the parties) the superior right of plaintiffs to the names and "Marks" in question; and it obligates the corporate defendant to observe the plaintiffs' rights in the "Marks" in question.

It is therefore immaterial that but for the contract the words or "Marks" in question might lawfully be used by anyone. Most things which people contract not to do (such as practice medicine, Beam v. Rutledge, 217 N.C. 670, 9 S.E.2d 476 (1940)) are lawful things which *but for* the contract they might do freely.

Article 10 of the agreement states that "This agreement shall be *interpreted and construed* under the laws of the State of Georgia." Whether the agreement regarding Georgia law binds the Court in this equity proceeding may be a moot point. Regardless of the answer to that question, it appears that Georgia law and North Carolina law are sufficiently similar that the result here ought to be the same regardless of which law is applied. Beam v. Rutledge, 217 N.C. 670, 9 S.E.2d 476 (1940); Jewel Box Stores Corporation v. Morrow,

**964**

272 N.C. 659, 158 S.E.2d 840 (1968); Thompson v. Turner, 245 N.C. 478, 96 S.E.2d 263 (1957) (covenant upon sale of business not to compete for life of vendor); Orkin Exterminating Co. of South Georgia v. Dewberry, 204 Ga. 794, 51 S.E.2d 669, 675–676 (1949) (greater latitude is tolerated in restrictive agreements to take effect on sale or dissolution of business than in personal employment contracts); Clein v. Kapiloff, 213 Ga. 369, 98 S.E.2d 897 (1957).

█ The Court by virtue of the diversity of citizenship of both plaintiffs and both defendants has jurisdiction over the suit. All parties are properly in court. The amount in controversy exceeds $10,000.00. The contract in question was duly executed. The corporate defendant is violating the restrictions imposed by the contract. These violations threaten irreparable harm to plaintiffs, for which a remedy in damages is inadequate.

Based upon the foregoing findings of fact and conclusions of law, it is the opinion of the Court that pending further orders of Court, the corporate defendant and all who may act as its officers, servants or agents, should be restrained and enjoined from:

1. Using the distributor's name, "OVERHEAD DOOR CO. OF CHARLOTTE, INC.," or the Marks, including the trade name "OVERHEAD DOOR" and "OVERHEAD," in connection with its business of selling upward acting doors and related products; and

2. Failing to advise the Southern Bell Telephone & Telegraph Company in writing that the telephone numbers used in connection with the business and franchise of Overhead Door Co. of Charlotte, Inc. may be assigned by the telephone company as requested by the plaintiffs. The Court realizes that telephone subscribers do not own the numbers assigned to them, and that such an order and the indicated action by the defendants will not bind the telephone company; but having agreed to make the representations to the telephone company, the corporate defendant will be expected to carry out its agreement. U-Haul Co. of North Carolina, Inc. v. Jones, 269 N.C. 284, 152 S.E.2d 65 (1967).

Let an order issue accordingly.