**SAS GROUP, INC. Plaintiff,**

v.

**WORLDWIDE INVENTIONS, INC. Defendants.**

**No. 02 CIV.7497 (CM).**

United States District Court, S.D. New York.

Feb. 13, 2003.

Kevin Harrington, Harrington, Ocko & Monk, L.L.P., White Plains, for SAS Group, Inc., plaintiff.

## MEMORANDUM DECISION AND ORDER

McMAHON, District Judge.

Plaintiff SAS Group, Inc. ("SAS") brought this suit in diversity against defendant Worldwide Inventions, Inc. ("Worldwide") for breach of contract, unjust enrichment, and fraud and misrepre-

sentation. Worldwide moved for dismissal pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for lack of personal jurisdiction.

This court held an evidentiary hearing on January 23, 2003, after which plaintiff moved to dismiss voluntarily its third cause of action for fraud and misrepresentation. Since Worldwide has neither filed an answer nor opposed SAS's motion to dismiss its third cause of action, SAS is entitled to dismissal of its claim pursuant to Rule 41(a)(1)(i) of the Federal Rules of Civil Procedure. As a result, only Worldwide's motion to dismiss SAS's breach of contract and unjust enrichment claims remains for consideration.

For the following reasons, Worldwide's motion is denied.

### FACTS

The following discussion represents the court's findings of fact relevant to disposition of the motion.

Worldwide is a Florida corporation that finds and develops new products, and either licenses the products to others or manufactures the products itself. [Bart Test., Hr'g Tr. 4]. SAS is a New York corporation that markets products to mass merchandisers, retail chains, and stores throughout the United States and overseas, as well as on direct response television. [Amended Compl. ¶ 7].

In May of 2001, Worldwide's president and vice president, Mitchell Garfinkel and Philip Bart, traveled to New York in order to meet with Michael Sobo, the president of SAS. [Bart Test., Hr'g Tr. 15]. The purpose of the visit was to try and license or sell its goods to SAS.[1] Id. at 18. The two companies had no business relationship prior to that time. [Garfinkel Aff. ¶ 6]. In fact, Sobo had never heard of Worldwide prior to May of 2001. [Sobo Test., Hr'g Tr. 40].

Bart and Garfinkel visited SAS at its corporate headquarters in Tarrytown, New York. [Bart Test., Hr'g Tr. 7]. They brought at least three sample products to the meeting—a "walking dog," a radio-controlled "motor ball," and "slap wraps"—and they demonstrated how the products worked.[2] Id. at 8–10.

Sobo did not express interest in any of Worldwide's products other than the "slap wraps." [Sobo Test., Hr'g Tr. 33–34]. Bart told Sobo that he would be able to manufacture and sell to him "slap wraps" in various styles. They also discussed pricing at the meeting, but only in general terms. Bart told Sobo that pricing depended on quantity and other variables, but that the "slap wraps" would generally cost less than a dollar. [Bart Test., Hr'g Tr. 23; Sobo Test., Hr'g Tr. 41–42].

After the New York meeting in May, Sobo kept in touch with Bart and Garfinkel via telephone, fax, and email. They contacted each other approximately once every week or two to discuss issues such as pricing and the specifics of how Worldwide planned to manufacture the "slap wraps." [Sobo Test., Hr'g Tr. 34, 37–38; Bart Test., Hr'g Tr. 47]. Despite these relatively frequent contacts, the parties failed to finalize a deal by the end of summer 2001.

Then the terrorist attacks of September 11 occurred, and either SAS or Worldwide (or both of them) came up with a crass marketing idea to cash in on the renewed

---

1. Garfinkel and Bart also met with representatives from Hasbro. That meeting is not relevant to the merits of this motion.

2. "Slap wraps" are "wrist bands for children that are straight but snap into place when they are tapped on a child's wrist." [Defendant's Memorandum 2].

patriotism that developed in the wake of those events—"slap wraps" with images of the American flag printed on them. Worldwide sent SAS a prototype of the flag "slap wrap," and SAS sent Worldwide a purchase order for 100,008 of them on November 11, 2001. [Sobo Aff. ¶ 11]. Worldwide sent SAS an invoice, and SAS paid for the "slap wraps" in two installments on November 20, 2001 and January 23, 2002. *Id.* at ¶ 12.

At some point thereafter, a dispute developed between the parties. SAS claims that Worldwide sent a second invoice to SAS, even though SAS never submitted another purchase order, billing SAS for "slap wraps" and related charges totaling $82,436.01. *Id.* at ¶ 13. SAS further claims that its accounting department "erroneously" paid the second invoice because it mistakenly thought the invoice related to goods covered by the purchase order for 100,008 "slap wraps." *Id.* at ¶ 14. SAS demanded that Worldwide return those funds, and Worldwide has refused to do so. *Id.* at ¶ 15.

Worldwide tells a different version of these events. Worldwide does not dispute that SAS ordered 100,008 "slap wraps" and paid for them in two installments. [Garfinkel Aff. ¶¶ 7–8]. But Worldwide contends that neither SAS nor Toys R Us (for whom the 100,008 "slap wraps" were ultimately meant) ever picked up the bracelets and they continued to sit in the factory in Florida. *Id.*

Worldwide additionally alleges that it then received a call from SAS concerning a new, separate order of 102,888 "slap wraps" for Wal–Mart, which SAS indicated it needed quickly. *Id.* at ¶ 10. Worldwide filled that order in part with some of the "slap wraps" manufactured in connection with the Toys R Us order, and shipped the 102,888 bracelets to Wal–Mart on or about March 8. *Id.* Worldwide then sent SAS an invoice in the amount of $82,436.01, which SAS paid. *Id.* Worldwide further contends that it replenished the "slap wraps" ordered for Toys R Us, which are still available in Florida to be picked up by SAS or its customer. *Id.* at ¶ 11.

## DISCUSSION

■■■■ Personal jurisdiction in a diversity case is determined by the law of the state in which the district court sits. *Kernan v. Kurz–Hastings, Inc.,* 175 F.3d 236, 240 (2d Cir.1999). Federal law only enters the picture for the purposes of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee. *Robertson–Ceco Corp.,* 84 F.3d at 567. When an evidentiary hearing has been held, plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986).

■■■■ The Constitution, in particular the Due Process Clause, does not pose a barrier to assertion of personal jurisdiction in this case. Worldwide "deliberately reach[ed] out" beyond its home state for the purpose of establishing a business relationship with SAS and, as a result, it "purposefully availed [itself] of the forum and should have reasonably foreseen being haled into court here." *See Agency Rent A Car System, Inc.,* 98 F.3d at 32 (citing *Burger King,* 471 U.S. at 479–80, 105 S.Ct. 2174). As a result, the exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Rather, the main point of dispute in the present case is whether the exercise of jurisdiction comports with New York law. Both parties agree that personal jurisdic-

tion exists, if it exists at all, under Section 302(a)(1) of New York's long-arm statute. That statute provides that a court may obtain jurisdiction over a non-domiciliary defendant if (1) the defendant transacts business in New York; and (2) the cause of action arises out of that business activity. N.Y. C.P.L.R. 302(a)(1); *see also Cut-Co Indus.*, 806 F.2d at 365.

With respect to the first prong, "[t]here is no fixed standard by which to measure the minimal contacts required to sustain jurisdiction under the provisions of CPLR 302(a)(1)." *McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 381–82, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967). But at a minimum, a defendant who "transacts business" in New York must "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)) (internal quotation marks omitted). A court must consider the totality of circumstances when determining the existence of purposeful activity, and may not subject the defendant to jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *CutCo Indus.*, 806 F.2d at 365. It is the "nature and quality" and not the amount of New York contacts that determine the purposeful activity. *PaineWebber Inc. v. WHV, Inc.*, 1995 WL 296398, at *2 (S.D.N.Y. May 16, 1995). The requisite minimum contacts must provide a fair warning to the defendant of a possibility of being subject to courts of the forum state. *Spencer Trask Ventures, Inc. v. Archos S.A.*, 2002 WL 417192, at *3 (S.D.N.Y. Mar. 18, 2002).

As for the second prong of CPLR 302(a)(1), a claim "arises out of" a defendant's transaction of business in New York "when there exists 'a substantial nexus' between the business transacted and the cause of action sued upon." *Agency Rent A Car System, Inc.*, 98 F.3d at 31 (quoting *Sacody Technologies, Inc. v. Avant, Inc.*, 862 F.Supp. 1152, 1155 (S.D.N.Y.1994)). "The defendant['s] New York activities must be substantially proximate to the allegedly unlawful act before the cause of action can be said to arise out of those activities." *Xedit Corp. v. Harvel Indus. Corp.*, 456 F.Supp. 725, 729 (S.D.N.Y.1978).

"[A] plaintiff ... must secure personal jurisdiction over a defendant with respect to each claim [he or] she asserts." *First Capital Asset Management, Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 397 & n. 145 (S.D.N.Y.2002) (quoting 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.7 (2002)). As a result, I consider SAS's two causes of action in turn.

1. Breach of Contract

"[T]he test for transacting business under 302(a)(1) in contract actions can be somewhat imprecise." *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F.Supp. 13, 15–16 (S.D.N.Y.1996). Because "302(a)(1) is employed primarily in breach of contract actions," however, courts have developed certain principles that guide my analysis. *Goldstein v. CTT Mobile Management Services, Inc.*, No. 84 Civ. 824, 1985 WL 321, at *4 (S.D.N.Y. Feb. 26, 1985).

First, "[a]ny contract negotiations which indicate a purposeful invocation of the laws of New York State are transactions of business for purposes of New York's long arm statute," and a single transaction of business in New York may be sufficient. *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F.Supp. 13, 15–

16 (S.D.N.Y.1996). It does not matter whether the negotiations are preliminary, whether the contract is executed in New York, or whether performance is contemplated for New York. *Id.*

In addition, "[c]ontract negotiations in New York will satisfy [§ 302(a)(1)] if the discussions 'substantially advanced' or were 'essential to' the formation of the contract or advanced the business relationship to a more solid level." *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.,* 775 F.Supp. 650, 655 (S.D.N.Y.1991); *see also NW Direct Design & Mfg., Inc. v. Global Brand Marketing, Inc.,* 1999 WL 493348, at *3 (S.D.N.Y. July 12, 1999) ("Courts have consistently held that contract negotiations occurring in New York are sufficient to support jurisdiction when they either 'substantially advance' or were 'essential' to the formation of a contract or if they resulted in a more solid business relationship between the parties."); *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1531 (S.D.N.Y.1985) ("Preliminary negotiations in New York that are 'essential to the existence of the contract' provide sufficient contact to establish New York's personal jurisdiction over the non-domiciliary defendant."); *Goldstein v. CTT Mobile Management Services, Inc.,* No. 84 Civ. 824, 1985 WL 321, at *4 (S.D.N.Y. Feb. 26, 1985) ("A long line of cases has established that § 302(a)(1) permits the assertion of jurisdiction over a defendant who has engaged in meetings or precontractual negotiations in New York, so long as those negotiations significantly advance or are essential to the formation of an agreement.").

Here, Worldwide's contacts with New York were purposeful, and not fortuitous or random. Garfinkel and Bart initiated a meeting with SAS's president (Sobo) in order to try to develop a business relationship. The meeting was essential to the eventual formation of the contract; the parties had no prior business relationship and Sobo had never heard of Worldwide before the meeting. And the meeting substantially advanced the formation of the contract—Bart and Garfinkel showed Sobo a sample of the "slap wrap" product at the meeting, Sobo expressed interest in the product, and they discussed pricing and availability.

Assuming *arguendo* that the meeting did not "substantially advance" or was not "essential" to the formation of the contract, it at the very least "advanced the business relationship to a more solid level." The parties went from a non-existent business relationship before the meeting to a situation in which they were discussing aspects of a prospective contract for the sale of a specific product, "slap wraps." Even if the meeting in New York "was solely for the purpose of conducting a demonstration and no negotiations took place during the meeting, jurisdiction may properly be asserted in this case." *Interface Biomedical Laboratories Corp. v. Axiom Medical, Inc.,* 600 F.Supp. 731, 736–37 (E.D.N.Y.1985). That is because the "only conceivable purpose of the demonstration was to foster a more solid relationship, if not a contract, with respect to the manufacture and marketing of ['slap wraps']." *Id.* at 737; *see also National Cathode Corp. v. Mexus Co.,* 855 F.Supp. 644 (S.D.N.Y.1994); *Edel Gems, Inc. v. Continental Jewelers, Inc.,* No. 91 Civ. 7030, 1992 WL 88174, at *3 (S.D.N.Y. Apr. 20, 1992) (collecting cases); *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.,* 782 F.Supp. 763, 770 (W.D.N.Y. 1991).

Worldwide argues that its contacts with New York were too attenuated to constitute "transacting business" under Section 302(a)(1) because SAS ordered "slap

wraps" months after the New York meeting, and unlike the "slap wraps" demonstrated at the meeting the "slap wraps" SAS eventually ordered had a flag design. However, application of the principles articulated in the case Worldwide cites to support its argument, *CMNY Capital, L.P. v. Perry,* No. 97 Civ. 6172, 1998 WL 132846 (S.D.N.Y. Mar. 23, 1998), does not vitiate this court's jurisdiction over defendant.

In *CMNY,* the plaintiff had negotiated with defendant and a third party about a possible joint venture. The negotiations occurred between 1986 and 1988 and involved five meetings in New York. The negotiations ultimately collapsed, however, when the third party pulled out. Plaintiff and defendant then reached an agreement in 1991 after separate negotiations. Those negotiations did not occur in New York. "That a defendant my have met with a plaintiff on a prior occasion to discuss a different agreement," the court concluded, "does not confer jurisdiction to hear claims arising under a later agreement between the same parties." *Id.* at *5.

Here, the span of time (about five months) between defendant's New York activities and the eventual contract is considerable shorter than in *CMNY* (three years). And the contract between the parties did not involve different parties and separate negotiations. It is true that in this case SAS and Worldwide only executed the contract after September 11 led to the craze for flag-draped paraphernalia. The parties may not have entered into a contract as soon as they did absent the events of September 11. And it is highly unlikely that their transaction would have involved "slap wraps" with flags on them. But the parties negotiated about "slap wraps" continuously from the May meeting until entering into a contract, and the events of September 11 simply changed the calculus of the transaction with regard to timing and product design. This does not alter my conclusion that the May meeting, for the reasons enumerated above, substantially advanced the formation of the contract, were essential to the formation of the contract, and advanced the parties business relationship to a more solid level.

2. Unjust Enrichment

■ Worldwide's actions that were sufficient to constitute "transacting business" in New York in the context of SAS's breach of contract claim also suffice to satisfy that prong of Section 302(a)(1) in the context of plaintiff's unjust enrichment claim. This court's ability to exercise jurisdiction over SAS's breach of contract claim, however, does not obviate the need to inquire whether jurisdiction exists over its unjust enrichment claim. In other words, the fact that Worldwide's New York activities were sufficient to establish jurisdiction over the breach of contract claim does not mean that every cause of action that SAS may feasibly assert necessarily "arises from" those activities.

■ A plaintiff's cause of action "arises from" a defendant's New York activities when those activities are "substantially proximate to the allegedly unlawful acts." *Xedit Corp.,* 456 F.Supp. at 729. This determination "is necessarily one of degree, informed by considerations of public policy and fundamental fairness." *Id.*

Courts have held, for example, that preliminary negotiations that supported jurisdiction over a breach of contract claim were insufficient to support jurisdiction on the plaintiffs' misappropriation of trade secrets claims. *See Interface Biomedical Laboratories Corp. v. Axiom Medical, Inc.,* 600 F.Supp. 731, 736–37 (E.D.N.Y. 1985); *Xedit Corp. v. Harvel Indus. Corp.,* 456 F.Supp. 725 (S.D.N.Y.1978). In those cases, the courts concluded that the al-

leged acts that gave rise to the misappropriation of trade secrets causes of action were sufficiently separate from defendants' New York activities such that the causes of action did not arise from those New York activities. *See also Faherty v. Fender*, 572 F.Supp. 142, 146–48 (S.D.N.Y. 1983) (plaintiff's causes of action involving defendant's alleged misconduct in Texas litigation involving contract did not arise from contract negotiations in New York); *U.S. Mexican Development Corp. v. Condor*, No. 91 Civ. 5925, 1992 WL 27179, at *2 (S.D.N.Y. Feb. 5, 1992) (same).

 The present action differs from those cases, however, because SAS's cause of action (unjust enrichment) is more closely bound with Worldwide's New York activities.[3] Bart and Garfinkel traveled to New York to try and sell their products to SAS. Sobo expressed interest in purchasing "slap wraps." The parties subsequently entered into a contract for the sale of "slap wraps," and SAS paid for the products in full. Worldwide allegedly sent another invoice for "slap wraps" that SAS never ordered, and SAS accidentally paid for those slap wraps because they thought it related to their previous purchase. SAS now argues that Worldwide was unjustly enriched because SAS paid it for "slap wraps" it never ordered or received. In sum, Worldwide's alleged unjust enrichment is substantially proximate to its New York activities—a meeting where it solicited SAS's business and had preliminary discussions concerning the sale of slap wraps.

Thus, the present case is more similar to *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F.Supp. 763, 770 (W.D.N.Y.1991). In *GB Marketing*,

the court addressed whether it could exercise jurisdiction under Section 302(a)(1) on plaintiff's promissory estoppel, quantum meruit, and unjust enrichment claims. "[T]he combined effect of [defendant's New York] activities," the court concluded, "was, allegedly, to create a potentially lost-lasting business relationship between [the parties], pursuant to which [plaintiff] undertook to promote the sale of [defendant's] product. It is out of that relationship that these claims arise." *GB Marketing USA Inc.*, 782 F.Supp. at 771. *See also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198 (S.D.N.Y.2002) (finding nexus between plaintiff's causes of action, including unjust enrichment, and defendant's New York activities); *Stewart v. Adidas A.G.*, No. 96 Civ. 6670, 1997 WL 218431 (S.D.N.Y. Apr. 30, 1997) (finding nexus between plaintiff's copyright claim and defendant's New York activities); *Edel Gems, Inc. v. Continental Jewelers, Inc.*, No. 91 Civ. 7030, 1992 WL 88174, at *3 (S.D.N.Y. Apr. 20, 1992) (finding nexus between plaintiff's claim and defendant's activities in New York that created likelihood of a more solid business relationship); *Hedlund v. Products From Sweden, Inc.*, 698 F.Supp. 1087, 1091 (S.D.N.Y. 1988) (finding nexus between plaintiff's tort claim and defendant's negotiations in New York).

## CONCLUSION

For the reasons stated above, Worldwide's motion to dismiss is denied. This is the decision and order of the Court.

---

**3.** In order to recover for unjust enrichment, a claimant must establish (1) that the defendant was enriched; (2) that such enrichment was at plaintiff's expense; and (3) that equity and good conscience demand that the defendant return the money or property to the plaintiff. *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 19 (2d Cir.1983).