**SUNWARD ELECTRONICS, INC., Plaintiff–Appellee,**

v.

**Keith L. McDONALD, Robert D. McDonald and Dog Guard Out-of Site Fencing, Inc., Defendants–Appellants.**

Docket No. 03–7432.

United States Court of Appeals, Second Circuit.

Argued: Oct. 16, 2003.

Decided: March 3, 2004.

James W. Hulme, Cooper Erving & Savage, LLP (Phillip G. Steck, on the brief), Albany, NY, for Plaintiff–Appellee.

William Dunnegan, Perkins & Dunnegan, New York, NY, for Defendants–Appellants.

Before: OAKES, JACOBS, and POOLER, Circuit Judges.

POOLER, Circuit Judge.

Defendants–Appellants Dog Guard Out–of–Site Fencing, Inc., and Keith L. McDonald and Robert D. McDonald, the owners and officers of Dog Guard Out–of–Site Fencing, Inc. (collectively "Defendants") appeal from the April 23, 2003 judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, *District Judge*) granting Plaintiff–Appellee Sunward Electronics, Inc.'s ("Plaintiff") request for a preliminary in-

junction enjoining Defendants' use of Plaintiff's trademark and specifically, requiring Defendants to assign to Plaintiff any of its telephone numbers that feature Plaintiff's trade name or trademark in its phone book listing.

## BACKGROUND

Plaintiff, a New York corporation, manufactures and distributes pet fencing systems using the trade names and trademarks "Dog Guard" and "Out–of–Sight Fencing" ("Dog Guard"). The system functions by administering an electrical shock through a collar worn by the animal when the animal approaches a boundary established by an underground wire. On November 15, 1995, Defendants, an Alabama corporation and Alabama citizens, entered into an exclusive dealership agreement with Plaintiff's predecessor-in-interest whereby Defendants became authorized dealers of Dog Guard products in the Birmingham, Alabama region ("Dealership Agreement"). At one point, according to Plaintiff, Defendants were the top three DOG GUARD dealers in the country. Moreover, Defendant Keith L. McDonald helped recruit other Dog Guard dealers, frequently spoke at Dog Guard meetings and seminars, and tested new Dog Guard products.

Pursuant to the Dealership Agreement, Defendants were required to use Plaintiff's trade name and trademarks for "Dog Guard" and "Out–of–Sight Fencing" in connection with the sale of its pet containment systems. Section 7 of the Dealership Agreement states:

DEALER has the right to use and, unless otherwise instructed by [Plaintiff], shall use the tradename "DOG GUARD," for the term of this agreement. DEALER shall obtain necessary licenses, registrations and appropriate governmental authorities, as they pertain to DEALER'S business and territory. **DEALER will obtain a telephone listing under the tradename as specifically outlined by the [Plaintiff] in the territory assigned to DEALER.** The tradename registrations will automatically become the property of, and revert to, [Plaintiff] on termination of this agreement, and DEALER shall cause any such transfer to be made within 30 days of termination.

The Dealership Agreement also required Defendants to cease any use of Plaintiff's trade names following the dissolution of the dealership: "DEALER shall have no right after termination of this agreement to use the name 'DOG GUARD' or any similar name which may confuse or tend to confuse the general public."

The Dealership Agreement contained a one-year non-compete provision, whereby Defendants agreed to refrain from managing or joining any entity engaged in the production or sale of pet fence products within a certain sales territory.

Defendants' relationship with Plaintiff eventually deteriorated and they began selling pet fencing systems manufactured by Pet Stop, Inc., a competitor of Plaintiff. On or about February 27, 2003, Plaintiff terminated the Dealership Agreement. Plaintiff alleges that Defendants, however, continued to use the trademarks Dog Guard and Out–of–Site Fencing at their store and were passing off other products as manufactured by Plaintiff.

Most importantly, Defendants' listings in local phone books featured Plaintiff's trademark and trade name. The listings state "Dog Guard" and "Out–of–Sight Fencing" near the top of the ad and in bold, and then provide Defendants' phone number and web address (www.dogguardalabama.com). The listed phone numbers go to the Defendant's office, and at one point after the dissolution of the dealer-

ship, Defendants' office answering machine stated that it was "Pet Stop of Alabama (formerly Dog Guard of Alabama)." A copy of the listing at issue is attached hereto as Appendix A.

On March 20, 2003, Plaintiff filed a complaint against Defendants alleging false designation and unfair competition under the Lanham Act, common law trademark infringement, breach of contract, common law unfair competition, injury to business reputation and dilution, tortious interference, and cyber piracy. At that time, Plaintiff also moved by order to show cause for a preliminary injunction. On April 2, 2003, the district court heard oral argument on Plaintiff's motion. At that time, Plaintiff sought an order enjoining only Defendants' continued use of phone numbers featuring Plaintiff's trade name and trademark in its phone book listings. Plaintiff requested that Defendants discontinue using the phone numbers, or alternatively, that the phone numbers be sent to a neutral intercept operator who would provide the new phone numbers of both Plaintiff and Defendants. Defendants rejected these proposals on the grounds that (1) the district court lacked personal jurisdiction over them; and (2) even if personal jurisdiction was properly asserted, they had not violated the Lanham Act.

On April 23, 2003, the district court issued a preliminary injunction ordering Defendants to assign to Plaintiff the phone numbers at issue. On May 5, 2003, Defendants made a motion to stay the injunction pending appeal, which the district court denied on May 12, 2003. However, the district court, at that time, directed Plaintiff to maintain certain records of calls received by the assigned phone numbers.

## DISCUSSION

### I. Personal Jurisdiction

■ "The standard of review applicable to district court decisions regarding personal jurisdiction is clear error for factual findings and de novo for legal conclusions." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 151 (2d Cir.2001).

■ In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process. *See PDK Labs., Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997). Because the Lanham Act does not provide for national service of process, the New York state long-arm statute governs this inquiry. *See generally,* 15 U.S.C. § 1051, *et seq.;* FED. R. CIV. P. 4(k)(1)(A).

■ Section 302(a)(1) of the New York state long-arm statute provides that a court may exercise personal jurisdiction over any foreign defendant if that defendant "transacts any business within the state," and the claim arises from those business transactions. N.Y. CIV.PRAC.L. & R. § 302(a)(1). Several factors should be considered in determining whether an out-of-state defendant transacts business in New York, including:

(i) whether the defendant has an ongoing contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996) (internal citations omitted). Although all factors are relevant, no one factor is dispositive and other factors may be considered. *See id.* "[T]he ultimate determination is based on the totality of the circumstances." *Id.*

Here, the district court applied these factors and correctly found that Defendants transacted business in New York. The Dealership Agreement contained a New York choice of law clause. A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law. *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 367 (2d Cir.1986); *see also Sacody Technologies, Inc. v. Avant, Inc.,* 862 F.Supp. 1152, 1156 (S.D.N.Y.1994).

Moreover, Defendants maintained a continuous and on-going commercial relationship with Plaintiff, a New York business, after becoming Dog Guard dealers. The Dealership Agreement required Defendants to mail to Plaintiff certain payments and warranty cards. Each McDonald brother traveled to New York on two occasions to attend Dog Guard training programs. Defendants also purchased a substantial number of supplies from New York through Plaintiff. According to Plaintiff, "Defendants purchased enough systems to support approximately six thousand customers and realized annual sales in the last few years of approximately $75,000—$92,000." Plaintiff Br. at 12. Indeed, the amount of purchases by Defendants from New York alone may be sufficient to confer jurisdiction. *See Fashion Two Twenty, Inc. v. Steinberg,* 339 F.Supp. 836, 841 (E.D.N.Y.1971) (holding that there was jurisdiction over defendants that had previously purchased $30,000 worth of supplies in New York state).

Further, Plaintiff continuously supervised and assisted Defendants during the term of the Dealership Agreement. Plaintiff provided Defendants with training materials and other proprietary information to be used in selling, marketing, installing and maintaining Dog Guard products. It also supervised Defendants in its advertising efforts, provided Defendants with advertising templates, sample copies and camera ready artwork, and partially subsidized Defendant's advertising costs, including costs associated with advertising materials and listings in local phone books.

Finally, the district court noted that the Dealership Agreement could be read as imposing on Defendants on-going contractual duties to a New York corporation. Section twelve of the Dealership Agreement contains a one-year non-compete clause, which becomes effective upon the termination of the dealership. Thus, when the Dealership Agreement terminated in February 2003, Defendants continued to have an ongoing relationship with a New York corporation to refrain from competition until February 2004.

With respect to the "arising under" prong of the personal jurisdiction analysis, the district court correctly determined that Plaintiff's cause of action arose out of Defendants' New York business transactions. A cause of action "arises out of" a defendant's transaction of business in New York for purposes of Section 302(a)(1) when there exists an " 'articulable nexus' or a 'substantial relationship' " between transactions occurring within the state and the cause of action sued upon. *Kronisch v. United States,* 150 F.3d 112, 130 (2d Cir.1998). Defendants contend that Plaintiff's cause of action does not "arise" from New York transactions because the alleged trademark infringement occurred in Alabama, and only after their contract with Plaintiff expired. This argu-

ment is without merit. Plaintiff's Lanham Act claim sounds in tort. *See PPX Enter., Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124–25 (2d Cir.1984) (noting that "[Section 1125(a)] created a new statutory tort of false representation of goods in commerce"). Although Section 302(a)(1) is typically invoked in breach of contract cases, *see Hoffritz,* 763 F.2d at 59–62; *Agency Rent–A–Car,* 98 F.3d at 31, "it applies as well to actions in tort when supported by a sufficient showing of facts." *Singer v. Walker,* 15 N.Y.2d 443, 465, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965).

■ The exercise of long arm jurisdiction over Defendants by a New York court must also satisfy constitutional due process standards. *See Agency Rent A Car,* 98 F.3d at 32. The exercise of personal jurisdiction here comports with "traditional notions of fair play and substantial justice[,]" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted), because Defendants' contacts with New York were continuous and substantial, and in no way random, fortuitous or attenuated. *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 480, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Accordingly, the district court's exercise of personal jurisdiction over Defendants was constitutional.

■ As a final matter, we briefly comment on an error of law made by the district court. In asserting personal jurisdiction over Defendants, the district court stated that "the present dispute arises from business transacted in New York, irrespective of the specific grounds upon which [Sunward] seeks injunction." Not so. A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted. *See SAS Group, Inc. v. Worldwide Inventions, Inc.,* 245 F.Supp.2d 543, 548 (S.D.N.Y.2003) (quoting *First Capital Asset Mgmt. v. Brickellbush, Inc.,* 218

F.Supp.2d 369, 397 & n. 145 (S.D.N.Y. 2002)).

However, overall, the district court correctly found that Defendants transacted business in New York and that Plaintiff's cause of action has a substantial relationship to such transactions, and the exercise of personal jurisdiction is also constitutional. Accordingly, the district court properly exercised personal jurisdiction over Defendants.

## II. Preliminary Injunction

■ This Court reviews a grant or denial of a preliminary injunction for abuse of discretion. *TCPIP Holding Co., Inc. v. Haar Communications, Inc.,* 244 F.3d 88, 92 (2d Cir.2001).

■ In cases involving claims of trademark infringement under the Lanham Act, "as in other types of cases, a party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000). The party seeking the injunction must show a "clear" or "substantial" likelihood of success where the injunction sought is mandatory—i.e., it will alter, rather than maintain, the status quo. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). Here, the injunction sought by Plaintiff would alter the status quo by requiring Defendants to assign certain phone numbers to Plaintiff; consequently Plaintiff must show a clear or substantial likelihood of success on the

merits of its underlying trademark infringement action.

▮ To prevail on its trademark claim, Plaintiff must demonstrate that its unregistered trademark and trade name is distinctive,* and that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question . . . ." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 217 (2d Cir.2003) (internal quotations and citations omitted).

▮ There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 41–42 (2d Cir.1986). Thus, "[w]hen in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic." *Id.* at 42.

▮ Here, the district court properly issued the preliminary injunction because Plaintiff will likely succeed on the merits of its underlying claim for trademark infringement. The fact that Defendants are using without authorization Plaintiff's trademarks and trade name on their phone listings is not disputed. Defendants' listings in the phone book identify their phone number as the phone number for an authorized Dog Guard dealer and features the Dog Guard trademark.

Defendants present three flawed arguments in their defense: (1) the listings were accurate and authorized at the time they were published; (2) the balance of hardship weighs in their favor because, since approximately 80% of their business comes from new customers that locate them through the phone book, losing the phone numbers at issue would destroy their business; and (3) Plaintiff would not be harmed by Defendants' conduct because Plaintiff does not presently have a Dog Guard dealer in the Birmingham, Alabama region.

▮ First, the fact that Defendants were initially authorized to use Plaintiff's trademark is irrelevant. *See Church of Scientology,* 794 F.2d at 44; *see also Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.,* 576 F.Supp. 1055, 1060 (E.D.N.Y.1983) ("The continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes an additional trademark infringement[.]") (citations omitted). While Defendants argue that they "never acted in anything but an entirely lawful manner[,]" Defendants Br. at 10, "[i]t is well established that wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition, and that good faith is no defense." *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1065 (S.D.N.Y.1991) (citations omitted); *Apollo Distrib. Co. v. Apollo Imps. Inc.,* 341 F.Supp. 455, 458 (S.D.N.Y.1972) ("under the [Lanham Act], no intent to deceive . . . need be shown[.] It is sufficient that the public may be deceived."). Accordingly, the fact that the listings were accurate and authorized at the time it was published is irrelevant. The central inquiry here is whether Defendants' use of Plaintiff's trademark was authorized and accurate. It was not.

---

* Plaintiff does not dispute Defendants' assertion that Plaintiff's trademark and trade name in Dog Guard and Out–of–Sight Fencing are unregistered.

■ Defendants' second argument, that the loss of the phone numbers in question would destroy their business, should also be rejected because Defendants will not be substantially harmed by the injunction. The phone listings indicate that Defendants' phone number is the phone number for an authorized Dog Guard dealer. Customers calling the number expect to contact Dog Guard and not the McDonald brothers or a Pet Stop dealer. Thus, the preliminary injunction harms Defendants very little since new customers, which make up 80% of Defendants' callers, would call the phone numbers seeking Dog Guard products, products Defendants are no longer authorized to carry. Plaintiff, on the other hand, would suffer substantial harm if Defendants continued to use the phone numbers because customers may mistakenly believe that Defendants are authorized Dog Guard retailers or, upon learning the truth, business may be diverted from Dog Guard to Pet Stop.

■ Finally, Defendants contend that Plaintiff would not be harmed because they do not have an authorized Dog Guard dealer in the Birmingham area. This fact is also irrelevant because, since the listing would most likely cause consumer confusion, irreparable harm is presumed. *See Church of Scientology,* 794 F.2d at 42. Moreover, as a matter of law, Plaintiff is presumptively interested in expanding business to the Birmingham area by the fact that it previously had a dealership arrangement with Defendants. *See id.* at 45 ("Once a licensor authorizes a licensee to use the mark in a particular area, he has demonstrated his desire to expand into that area[.]").

In sum, the district court properly issued the preliminary injunction because Plaintiff established that they were likely to succeed on the merits of its trademark infringement claims and also that they would suffer irreparable injury absent the injunction.

## III. The Scope of the Preliminary Injunction

■ "[A] preliminary injunction is a specific equitable remedy and thus, must be framed in such a way as to strike a delicate balance between competing interests. By necessity, the scope of the injunction must be drawn by reference to the facts of the individual case, reflecting a careful balancing of the equities." *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62, 67 (2d Cir.1985); *see also Patsy's Brand,* 317 F.3d at 220. A preliminary injunction should "enjoin only those uses that are likely to create appreciable confusion, and no more." *Joseph Scott Co.,* 764 F.2d at 67 (citing *Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914)). While we hold that the preliminary injunction was properly issued and therefore do not vacate it, we remand this case to the district court so that it may conduct a factual inquiry into the scope of the injunctive order and modify it if necessary.

Here, the district court ordered Defendants to assign to Plaintiff any phone numbers currently listed as phone numbers for Dog Guard or Out–of–Sight Fencing, even though the Dealership Agreement did not require such an assignment when the dealership terminated. The district court and Plaintiff both cite to *Midas Int'l Corp. v. T & M Unlimited, Inc.* as support for the preliminary injunction. 2000 WL 1737946 (W.D.N.Y. Nov.17, 2000). *Midas,* however, is distinguishable from the case here because in *Midas* the franchise agreement provided that the franchisee's telephone number would be transferred to the franchisor upon termination of the franchise. *Id.* at *1.

*Midas* represents the majority of cases where a franchisee is ordered to assign its phone number to the franchisor. *See, e.g., Merry Maids Ltd. P'ship v. Kamara*, 33 F.Supp.2d 443, 444 (D.Md.1998); *Two Men and a Truck/Int'l, Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 1995 WL 549278, *7 (W.D.Mich. July 24, 1995); *Gold v. Holiday Rent–A–Car Int'l, Inc.*, 627 F.Supp. 280, 282 (W.D.Mo.1985); *Overhead Door Corp. v. Nathanson*, 291 F.Supp. 961, 962 (W.D.N.C.1968). In all of these cases, the relevant franchise agreement required such a transfer following termination of the franchise, and the district court merely ordered enforcement of the agreement.

But, in this case, the Dealership Agreement did not require transfer of Defendants' phone numbers following termination. In some cases where the contract at issue did not contain a phone number transfer provision, the court required the franchisee simply to discontinue using any phone numbers that featured the franchisor's trade name in advertising materials or phone book listings. *See Multi–Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199, 206 (E.D.N.Y.1993); *R.L. Polk & Co. v. INFOUSA, Inc.*, 230 F.Supp.2d 780, 797 (E.D.Mich.2002). There are also cases where the former franchisee is required to transfer its phone number to an independent answering service that would inform callers where they can contact the franchisor and the franchisee. *See, e.g., Joseph Scott*, 764 F.2d at 66 n. 2; *Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.*, 783 F.Supp. 53, 71 (E.D.N.Y.1991); *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 508 (7th Cir. 1994).

We therefore remand this case to the district court so that it may determine which of these alternatives would be least restrictive while still able to address Plaintiff's concerns. It may be that transferring the phone numbers at issue to an independent answering service would best serve this purpose, although we leave it to the district court to so determine after it conducts a factual hearing on this discrete issue.

APPENDIX

# Sunward Electronics v McDonald

## 03-7432

## Decided: March 3, 2004